# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LYNN E. TALLEY, D.O., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CHRISTIANA CARE HEALTH SYSTEM, ) <br> MATTHEW K. HOFFMAN, MD, and ) <br> KENNETH L. SILVERSTEIN, MD, ) <br> ) <br> Defendants. ) | Civil Action No. 17-926-CJB |

Michele D. Allen and Catilyn E. Quinn, LAW OFFICES OF MICHELE D. ALLEN, LLC, Hockessin, DE, Attorneys for Plaintiff.

Joanna J. Cline and James H. S. Levine, PEPPER HAMILTON LLP, Wilmington, DE; Barbara T. Sicalides, Barak A. Bassman, and Megan Morley, PEPPER HAMILTON LLP, Philadelphia, PA, Attorneys for Defendants.

## MEMORANDUM OPINION

October 11, 2018
Wilmington, Delaware

*[signature: Christopher J. Burke]*

**BURKE, United States Magistrate Judge**

Plaintiff Lynn Talley ("Plaintiff") filed this action alleging violations of the Sherman Act, breach of contract, lack of procedural due process, defamation, intentional infliction of emotional distress, interference with prospective economic advantage, tortious interference with contractual relations, and breach of the covenant of good faith and fair dealing. (D.I. 17) Presently before the Court is the motion of Defendants Christiana Care Health System ("Christiana Care"), Matthew K. Hoffman, M.D. ("Dr. Hoffman"), and Kenneth L. Silverstein, M.D. ("Dr. Silverstein") (collectively, "Defendants") seeking to dismiss Counts I-VIII of the operative First Amended Complaint ("FAC"), filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 22) This opinion addresses only the portion of Defendants' Motion seeking dismissal of the Sherman Act claim, and GRANTS the Motion with prejudice in that regard.

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties

Plaintiff is a board-certified physician in the field of obstetrics and gynecology ("OB-GYN"). (D.I. 17 at ¶¶ 2, 15) She is a resident of Pennsylvania and previously had a private practice in Newark, Delaware. (*Id.* at ¶¶ 2, 10)

Christiana Care, a teaching hospital, is a private, non-profit corporation with its headquarters located in Newark, Delaware. (*Id.* at ¶ 3, 34)[1] Dr. Hoffman works in Delaware as

---

[1] In the Factual Background section, the Court is almost exclusively relying on the allegations in the FAC, as it must at this stage. In its briefing, however, Defendants note that Defendant Christiana Care is actually the parent of several entities through which it provides medical services; one of those entities is Christiana Care Health Services, Inc. ("Health Services"), which operates several campuses in Delaware as a teaching hospital. (D.I. 23 at 3) Christiana Hospital, one Health Services campus, is said by Defendants to be the place where

2

the Chair of Obstetrics and Gynecology at Christiana Care. (*Id.* at ¶ 4) Dr. Silverstein works in Delaware as the Chief Clinical Officer of Christiana Care. (*Id.* at ¶ 5)

### 2. Plaintiff's Tenure at Christiana Care and the Events Leading to Her Termination

Plaintiff, a member of the Medical-Dental Staff at Christiana Care from 1982 until her termination in July 15, 2016, was granted privileges to practice medicine at Christiana Care in accordance with the Medical-Dental Staff Bylaws ("Bylaws") and the Medical-Dental Staff Credentials Manual ("Credentials Manual"). (*Id.* at ¶¶ 16-17) Plaintiff was a member of the Safety First Committee of Christiana Care, which reviewed specific cases of concern, evaluated safety processes, and established protocols. (*Id.* at ¶ 21-22) After Plaintiff expressed concerns during Safety First Committee meetings regarding patient safety related to Christiana Care's policy and procedures, Christiana Care placed Plaintiff on a "Focused Professional Practice Evaluation[,]" which required Plaintiff's professional judgement to be "second guessed by attendees who had significantly less experience and knowledge than Plaintiff about her patients[.]" (*Id.* at ¶ 23) Plaintiff alleges that Christiana Care took this step in order to "humiliate, harass[,] and retaliate against her." (*Id.* at ¶ 26)

On July 7, 2014, Plaintiff had a verbal altercation with the former Chair of Obstetrics and Gynecology, and was thereafter "forced" to take a voluntary leave of absence. (*Id.* at ¶¶ 27-28) Plaintiff states she was threatened that if she did not take the leave of absence, she would be subjected to worse consequences. (*Id.* at ¶ 29) Plaintiff was "cleared" to return to work less than

---

most of the events described in the FAC occurred. (*Id.*) So, although the FAC alleges that Defendant Christiana Care is itself a teaching hospital, it may be more accurate to say that Christiana Care is the parent of an entity that runs a teaching hospital on various campuses, one of which (Christiana Hospital) is where the events at issue here took place.

3

a month later, but she asserts that Christiana Care did not actually allow her to return to work until August 22, 2014. (*Id.* at ¶¶ 30-31)

Plaintiff further alleges that Christiana Care "forc[ed] residents to 'spy' on [her] and encourage[ed] them to make reports/complaints against [her]." (*Id.* at ¶ 33) This caused an environment at the hospital where residents challenged Plaintiff's "professional opinions and clinical judgments [] without any basis." (*Id.* at ¶ 35) Plaintiff states that residents were told that Christiana Care was "'gathering evidence' against Plaintiff[;]" for example, Residency Director Dr. Anthony Sciscione allegedly encouraged residents to monitor Plaintiff and complain about Plaintiff's clinical judgments, despite the fact that "numerous other colleagues had stated Plaintiff's clinical practice skills were excellent[.]" (*Id.* at ¶¶ 36-38) Plaintiff alleges that Dr. Sciscione used his influential position to cause the residents to make these "unsubstantiated complaints" against Plaintiff, which were "blindly accepted." (*Id.* at ¶¶ 41-43) Based on two such resident complaints, on July 14, 2015, Plaintiff was removed from teaching service for four weeks. (*Id.* at ¶ 44)

Then, around March 24, 2016, Christiana Care precautionarily suspended Plaintiff. (*Id.* at ¶ 47) This suspension came about because of Christiana Care's stated concern that Plaintiff's behavior and interactions did not promote a working environment that was "conducive to team-based patient care" or to the "education of residents." (*Id.* at ¶ 49) Plaintiff submitted her response to the precautionary suspension to Dr. Silverstein on April 4, 2016. (*Id.* at ¶ 48)

Because her privileges were now suspended, Plaintiff had to seek immediate coverage for her patients. (*Id.* at ¶ 53) Plaintiff asserts that Christiana Care's ultimate intention was for its OB-GYN hospitalists and its OB-GYN group in Greenville, Delaware to absorb Plaintiff's patients. (*Id.* at ¶ 55)

4

Around April 9, 2016, Plaintiff's patient (referred to as "Patient B" in the FAC) was allegedly told by a Christiana Care nurse that Plaintiff would no longer be working at Christiana Care because Plaintiff had lost her privileges. (*Id.* at ¶ 56) Patient B was referred to the Christiana Care Greenville OB-GYN practice and to another non-Christiana Care facility, (*id.* at ¶ 57), and ultimately switched her OB-GYN care to the non-Christiana Care facility, (*id.* at ¶ 59).

Around April 11, 2016, another patient's (referred to as "Patient D" in the FAC) spouse was wrongly informed that Plaintiff was "removed from staff." (*Id.* at ¶ 62) Patient D's spouse, angry upon hearing this, went to Plaintiff's office and belligerently announced to everyone in Plaintiff's waiting room that Plaintiff was no longer at Christiana Care. (*Id.* at ¶¶ 63-64)

Plaintiff's suspension was lifted on April 23, 2016 and her full privileges were restored. (*Id.* at ¶¶ 67-68) But less than two months later, on July 13, 2016, Dr. Hoffman called Plaintiff and informed her that she would be terminated from the Medical-Dental Staff of Christiana Care, effective July 15, 2016 at 5:00 p.m. (*Id.* at ¶ 72) On the same date (July 13, 2016) as Plaintiff received the call from Dr. Hoffman, Dr. Silverstein sent a letter to Plaintiff, which reiterated that Plaintiff's privileges would be terminated as of July 15. (*Id.* at ¶ 83; D.I. 23, ex. A)[2] The letter explained that Christiana Care's Board had previously approved a renewal of Plaintiff's privileges only on certain conditions, including that Plaintiff have "no further workplace concerns regarding behavioral or clinical issues found by the Dept. of OB/GYN peer review committee to constitute at risk or reckless behavior." (D.I. 23, ex. A) The letter went on to state

---

[2] Although it is not attached as an exhibit to the FAC, Defendants included a copy of this letter as an exhibit to their opening brief. (D.I. 23, ex. A) The letter is referenced in the FAC and Plaintiff's claims are clearly "based on" the letter, (D.I. 17 at ¶ 83); thus, the Court may consider the contents of the letter when reviewing this Rule 12(b)(6) Motion. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F. 2d 1192, 1196 (3d Cir. 1993).

5

that on July 12, 2016, "the Professional Excellence Committee . . . reviewed two workplace concerns [and] determined that [they] were substantiated and constituted unacceptable at-risk behavior" and thus that Plaintiff's "medical staff membership and clinical privileges have been revoked." (*Id.*)

Plaintiff alleges that her termination was contrary to the Manual and Bylaws, because the decision was "not reviewed by any reviewing committee, including but not limited to the Medical Executive Committee[.]" (*Id.* at ¶ 76) She asserts that prior to any change affecting her staff privileges, either Dr. Hoffman or the designated departmental committee was required to: (1) report in writing the grounds suggesting the need for corrective action against her; (2) report any prior peer reviewed actions to date; and (3) recommend specific corrective/disciplinary action. (*Id.* at ¶ 78) But according to Plaintiff, no such report was ever prepared by Dr. Hoffman or others, prior to her termination. (*Id.* at ¶ 79) And according to Plaintiff, if any such report was generated, it should have been submitted to and considered by the Staff Credentials Committee and (if that committee decided that further corrective or disciplinary action was necessary) the Medical Executive Committee. (*Id.* at ¶ 80) According to Plaintiff, however, no committee, including the Staff Credentials Committee or the Medical Executive Committee, made any recommendation regarding the termination of her privileges. (*Id.* at ¶¶ 81-82) Instead, according to Plaintiff, Dr. Silverstein "took unilateral action" to terminate her privileges. (*Id.* at ¶ 83)

Plaintiff asserts that after termination of her privileges, she attempted to have another solo practitioner assist her with the transition and care of her patients. (*Id.* at ¶ 88) According to Plaintiff, however, Defendants "threatened" the solo practitioner and told him that he "had to

6

sign" an agreement prepared by Christiana Care's counsel, which stated that he would not assist Plaintiff with coverage for her patients. (*Id.* at ¶¶ 88-89)

There was a provision in Plaintiff's lease with the owner of the building that housed Plaintiff's private practice office; the provision required Plaintiff to maintain privileges at Christiana Care. (*Id.* at ¶ 102) After losing privileges, Plaintiff was granted one year to sell the property. (*Id.* at ¶ 103) Christiana Care held a right of first refusal and exercised that right to prevent Plaintiff from selling the property to another practitioner. (*Id.* at ¶ 104) Plaintiff asserts that if Christiana Care gains 51% control of this building, it will be able to make the other building tenants sell their offices for fair market value. (*Id.* at ¶ 105)

### B. Procedural Background

On July 10, 2017, Plaintiff filed her initial Complaint. (D.I. 1) The case was referred to the Court on July 12, 2017 for handling through case-dispositive motions. The parties thereafter jointly consented to the Court's jurisdiction to conduct all proceedings in the case. (D.I. 11)

The instant Motion was filed on November 6, 2017, (D.I. 22), and was fully briefed as of January 9, 2018, (D.I. 32). The Court granted Defendants' request for oral argument, (D.I. 33), and following a postponement at Plaintiff's request, (D.I. 46), argument was held on June 27, 2018, (D.I. 53, hereafter "Tr.").

## II. STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss pursuant to Rule

7

12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

In assessing such a motion, first the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft*, 556 U.S. at 679). A plausible claim does more than merely allege entitlement to relief; it must also demonstrate the basis for that "entitlement with its facts." *Id.* Thus, a claimant's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted).

## III. DISCUSSION

Count I of Plaintiff's FAC alleges that Defendants violated Section 1 of the Sherman Act ("Section 1"). (D.I. 17 at 14-18) Section 1 prohibits "[e]very contract ... or conspiracy, in restraint of trade or commerce[.]" 15 U.S.C. § 1. In order to adequately plead a Section 1 claim, a plaintiff must sufficiently allege the following elements: "(1) an agreement; (2) imposing an unreasonable restraint of trade within a relevant [] market; and (3) resulting antitrust injury." *CAE Inc. v. Gulfstream Aerospace Corp.*, C.A. No. 15-924-LPS, 2017 WL 3279122, at *4 (D. Del. July 28, 2017) (internal quotation marks and citation omitted); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010).

Defendants assert numerous grounds on which Plaintiff's antitrust claim should be dismissed. (D.I. 23 at 6) The Court, however, need only rely on two of those grounds here to grant Defendants' Motion in this regard.[3] As is set out further below, Plaintiff has failed to sufficiently allege an agreement in restraint of trade, and Plaintiff failed to identify sufficient product and geographic markets.

## A.  Existence of an Agreement

The first element of a Section 1 antitrust claim is that the plaintiff must show that the defendant was a party to an agreement—that is, that it "was a party to a contract, combination[,] . . . or conspiracy." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315 (internal quotation marks and citation omitted); *see also Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639 (3d Cir. 1996) ("The very essence of a [S]ection 1 claim, of course, is the existence of an agreement.") (internal quotation marks and citation omitted). "[C]ourts have interpreted [the contract, combination, or conspiracy terms] to require some form of concerted action, . . . in other words, a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme[.]" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315 (internal quotation marks and citations omitted). Alternatively, "[u]nilateral activity by a defendant, no matter the motivation, cannot give rise to a [S]ection 1 violation." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).

In the body of Count I's Sherman Act claim, Plaintiff alleges that "Defendants, motivated by anti-competitive intent, acted in concert to restrict Plaintiff's clinical privileges without

---

[3]  The Court thus does not address the other deficiencies identified by Defendants regarding the Sherman Act claim: (1) that Plaintiff failed to sufficiently plead harm to competition in the relevant market; and (2) that Plaintiff failed to sufficiently allege antitrust injury. (D.I. 23 at 10-13)

providing due process afforded in the By[l]aws and the Credentials Manual." (D.I. 17 at ¶ 108) More specifically, in the body of this Count, Plaintiff alleges that certain of Christiana Care's committees, such as the "Christiana Care Health Services Department of Obstetrics and Gynecology Credentials Committee, the Christiana Care Health Services Staff Credentials Committee, the Medical Executive Committee, and Christiana Care Health Services Department of OB-GYN Peer Review Committee" were "involved in the credentialing, suspension, and arguably, certain aspects of the termination of Plaintiff's privileges." (*Id.* at ¶ 109) Additionally, she alleges that "[c]ertain members of the Medical-Dental Staff, as well as practitioners in private practice serving on the committees which affected Plaintiff's privileges" in fact "acted in concert to squeeze out Plaintiff and other solo practitioners" and "engaged in a combination or conspiracy to restrain competition in the relevant markets[.]" (*Id.* at ¶¶ 110-11)

The problem here, as Defendants note, (D.I. 23 at 6-7), is that there are no facts alleged in the FAC to support these conclusory statements. For example, other than briefly mentioning the titles of these committees and making vague reference to these unnamed "practitioners," the remainder of the FAC does not include any facts evidencing an actual agreement between or among any such persons, or between such persons and any of Defendants, that has anything to do with Plaintiff's termination.

To the contrary, the FAC includes various allegations that *contradict* the notion that Plaintiff's termination was the result of an agreement between any of the above-referenced persons.[4] For example, Plaintiff alleges three times in the FAC that Dr. Silverstein acted in a

---

[4]  While the Court must accept as true all well-pleaded facts at the Rule 12(b)(6) stage, it need not accept allegations that are contradicted by other allegations in the FAC. *See Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) (noting that "a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true"

10

"unilateral" fashion when he fired Plaintiff. (D.I. 17 at ¶¶ 75, 83, 151) The FAC also repeatedly notes that the revocation of Plaintiff's privileges "was not, and has never been, reviewed by an reviewing committee, including but not limited to the Medical Executive Committee." (*Id.* at ¶ 151; *see also id.* at ¶¶ 76, 81-82, 146, 150) If Dr. Silverstein acted "unilaterally" in terminating Plaintiff and bypassed any other committee in doing so, then Plaintiff's injury was assuredly not the result of any contract, combination, or conspiracy.[5]

---

when the allegations "are internally inconsistent") (internal quotation marks and citation omitted); *Dougherty v. Blize*, C.A. No. 07-674-SLR-LPS, 2008 WL 2543430, at *5 (D. Del. June 25, 2008) (same), *adopted in part by* 2008 WL 7278920 (D. Del. Oct. 7, 2008); *cf. Jaroslawicz v. M&T Bank Corp.*, 296 F. Supp. 3d 670, 676 (D. Del. 2017) (explaining that "the court need not accept as true allegations in the complaint contradicted by documents on which the complaint relies").

[5]   At oral argument, Plaintiff's counsel appeared to argue that an actionable agreement could possibly have been made "between Christiana Care physicians and the solo practitioner [referenced in the FAC], requir[ing] him to sign an agreement that he would not, in fact, assist Doctor Talley or her patients[.]" (Tr. at 47) By way of recap, in the FAC, Plaintiff alleges that a "solo practitioner[,]" who was assisting Plaintiff after her privileges were terminated, was "threatened by Defendants and told he had to sign a document prepared by Defendant Christiana Care's counsel stating that he would not assist Plaintiff with coverage for her patients." (D.I. 17 at ¶¶ 88-89)

There are many reasons why it is not plausible that Defendants could have made an actionable agreement (for purposes of Count I) *with* this solo practitioner. First, as Defendants' counsel noted at oral argument, the conspiracy alleged in Count I seems largely (if not entirely) asserted to be a conspiracy to "restrict [P]laintiff's clinical privileges[.]" (Tr. at 57-58; *see also* D.I. 17 at ¶¶ 107-37) Yet by the time Plaintiff had made arrangements with this solo practitioner to assist her with the transition of her patients, she already had seen her privileges terminated. (*Id.*) Second, Plaintiff did not argue in her opening brief that this solo practitioner was a party to any Count I-related conspiracy. (D.I. 31 at 9 ("Plaintiff has sufficiently pled the behavior of the Defendants and the committees which assisted in the taking of her clinical privileges.")) And third, it borders on frivolous for Plaintiff to now argue that this unnamed practitioner, who is alleged to have been "threatened" by Defendants and forced against his will to sign the document at issue, could plausibly be seen as having had a "unity of purpose" or "common design and understanding" with Defendants to harm Plaintiff's livelihood. The FAC suggests no such thing, and includes no further allegations as to whom amongst "Defendants" was said to have even interacted with this practitioner. (D.I. 17 at ¶ 89)

11

For these reasons, Plaintiff has failed to plead facts plausibly suggesting that she was the victim of a conspiracy for Sherman Act purposes.

B.  **Relevant Market**

In addition to alleging the existence of an agreement, "[p]laintiffs have the burden of defining the relevant market." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).[6] The relevant market includes consideration of both the product and the

---

[6]  In the FAC, Plaintiff alleges that she need not plead facts setting out the relevant market, because "Defendants' conduct is a *per se* violation [of Section 1 involving] a horizontal agreement among competitors to allocate markets and exclude competitors . . . from relevant service markets." (D.I. 17 at ¶ 125) "Under the *per se* standard, plaintiffs are relieved of the obligation to define a market and prove market power." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 316. Certain practices are considered illegal *per se* "'because the probability that these practices are anticompetitive is so high[.]'" *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents of Univ. of Ok.*, 468 U.S. 85, 100 (1984)). "Paradigmatic examples are 'horizontal agreements among competitors to fix prices or to divide markets.'" *Id.* (citation omitted).

In her brief, Plaintiff explains in a footnote that she "has alleged a *per se* violation because Defendants' conspiracy and anticompetitive business practices had no redeeming value as it restricted choice for Medicaid patients." (D.I. 31 at 9 n.5) Plaintiff however provides no support for the proposition that restricting a Medicaid patient's choice of available OB-GYN service providers (via one hospital's decision to terminate one physician's staff privileges) is the type of conduct that would warrant analyzing her claim under a *per se* standard. On the other hand, Defendants cite authority indicating that staffing decisions at hospitals, like that at issue in the instant case, are typically analyzed under the "rule of reason" standard. *See, e.g., BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 667 (7th Cir. 1994) (explaining that cases involving staff privileges and staffing patterns at a single hospital are "invariably analyze[d] . . . under the rule of reason[ as] there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many, or all"); *Mathews v. Lancaster Gen. Hosp.*, 883 F. Supp. 1016, 1036 (E.D. Pa. 1995) (citing cases), *aff'd*, 87 F.3d 624 (3d Cir. 1996); *see also Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 n.3 (3d Cir. 1999); *Friedman v. Delaware Cty. Mem'l Hosp.*, 672 F. Supp. 171, 190 (E.D. Pa. 1987), *aff'd*, 849 F.2d 600 (3d Cir. 1988), and *aff'd sub nom. Appeal of Friedman*, 849 F.2d 600 (3d Cir. 1988), and *aff'd*, 849 F.2d 603 (3d Cir. 1988). Further, although Plaintiff relied on the decision in *Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1984) to show that at least one court has analyzed a hospital staffing claim using the *per se* standard, (Tr. at 50-53), *Weiss* involved a very different set of facts. There, the district court had found that the defendants' refusal to hire osteopathic physicians was a boycott or concerted refusal to deal with osteopathic doctors, not with any one individual doctor (like Plaintiff here).

geographic markets. *Id.* at 442 (explaining that a Section 1 claim requires that the plaintiff prove that the concerted action "produced anti-competitive effects within the relevant product and geographic markets").

Plaintiff alleges that the relevant product market is the "field of Obstetrics and Gynecology at Christiana Care." (D.I. 17 at ¶ 117) She also alleges that the relevant geographic market is the "state of Delaware, specifically New Castle County, Delaware." (*Id.* at ¶ 118)[7] The Court will address both markets in turn.

1. **Product Market**

"'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Queen City Pizza, Inc.*, 124 F.3d at 436 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1992) ("The relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes[,]' and includes factors such as] price, use[,] and qualities.") (citations omitted). Viewing all factual inferences in favor of the plaintiff, a court may grant a motion to dismiss based on insufficient pleading of the relevant market "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant

---

*Weiss*, 745 F.2d at 818. For these reasons, the Court is not persuaded by Plaintiff's argument that her claim is subject to a *per se* standard, and as such she needs to plead the relevant market.

[7] Due to this confusing use of language, it is not clear whether the FAC is alleging that the relevant geographic market is the entire state of Delaware or simply New Castle County, Delaware. The Court will assume, for sake of argument, that it is the former, (*see* D.I. 31 at 11), though the ultimate result here would be no different were it alleged to be the latter.

13

market that clearly does not encompass all interchangeable substitute products." *Queen City Pizza, Inc.*, 124 F.3d at 436.

Here, the FAC contains very few facts that even nod at the concept of reasonable interchangeability of use or cross-elasticity of demand. The only reference to these concepts at all seems to come when the pleading notes that Christiana Care is "by far the most advanced maternal hospital in the state, with the only Level 3 neonatal intensive care unit ['ICU']" and that the only other hospital in Northern Delaware, Saint Francis Healthcare, "does not have a Level 3 neonatal ICU." (D.I. 17 at ¶¶ 119-20) Yet as Defendants note, there are no other facts pleaded that explain *why* other providers of OB-GYN services are not reasonably interchangeable with those at Christiana Care or *why* the fact that Christiana Care has a Level 3 neonatal intensive care unit (and that other hospitals nearby may not) is relevant to the product market issue. (D.I. 23 at 8-9); *see also Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (granting a motion to dismiss a Sherman Act counterclaim due to the plaintiff's failure to support his definition of the relevant product market, where the plaintiff did not "provide any factual basis nor analysis to support his bare assertion that the relevant market is asphalt shingle roof ridge vents[,]" such as by "explain[ing] why [those vents] are distinct from . . . any other roofing products").[8] Compounding the problem, Plaintiff's answering brief did not substantively address this issue either. (*See* D.I. 31 at 9-11)

---

[8] It is also worth mentioning that "[c]ourts routinely reject Sherman Act claims at the motion to dismiss stage where such claims involve single-brand or single-manufacturer product markets." *Satnam Distribs. LLC v. Commonwealth-Altadis, Inc.*, 140 F. Supp. 3d 405, 419 (E.D. Pa. 2015) (citing cases); *see also Queen City Pizza, Inc.*, 124 F.3d at 440 (finding that the proposed product market was insufficient at the motion to dismiss stage because the "Domino's approved supplies and ingredients [were] fully interchangeable in all relevant respects with other pizza supplies").

14

At oral argument, Plaintiff's counsel did finally respond to Defendants' arguments about the relevant product market. There, Plaintiff's counsel argued that the Motion was not subject to dismissal for failure to plead a relevant product market for two reasons: (1) because Plaintiff "only had privileges at Christiana Care" and (2) because that "the submarket of some of [Plaintiff's] higher risk patients, [M]edicare patients, [] tend to have pregnancies that would require more services that are available at Christiana Care[,]" such as a neonatal ICU that "is not available at St. Francis or some of the other local hospitals[.]" (Tr. at 37-38) Neither of these justifications, however, is ultimately persuasive.

For one thing, where Plaintiff had privileges to practice is not the focus when defining a product market. As was noted above, the relevant product market is "defined as those 'commodities reasonably *interchangeable by consumers* for the same purposes.'" *Tunis Bros. Co.*, 952 F.2d at 722 (emphasis added) (citations omitted). Thus, the focus is on whether there are other providers of OB-GYN services that the relevant consumers could go to—not solely on the one hospital where Plaintiff practiced. (*See* Tr. at 57 (Defendants' counsel noting that the relevant product market is "all about the patients' options and where they can turn[,]" not solely on where Plaintiff has privileges to provide services); *see also* D.I. 23 at 8-9)

Plaintiff's second justification—that the group of patients on Medicare or Medicaid[9] who have high-risk pregnancies (and who are said to need access to Christiana Care's Level 3 neonatal ICU) is relevant to this issue—is likewise unavailing. It is true that in some

---

[9] In the FAC, Plaintiff describes her patient base as including "a large number of patients on Medicaid." (D.I. 17 at ¶ 112) At oral argument, Plaintiff's counsel referenced both patients on Medicare and Medicaid. (Tr. at 32, 37-38, 48) Any distinction between Medicare and Medicaid is not essential to the Court's decision here and so the Court does not further distinguish between the two government programs in this opinion.

circumstances, "a well-defined submarket may constitute a relevant product market[,] and so under certain circumstances a relevant product could consist of one brand of a product[.]" *Tunis Bros. Co.*, 952 F.2d at 723; *see also Brown Shoe Co.*, 370 U.S. at 325 ("[W]ithin [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.").[10] Yet the difficulty for Plaintiff is that in the FAC, (D.I. 17 at ¶ 117), in her briefing, (D.I. 31 at 10), and at other points during oral argument, (Tr. at 32, 36-37), she has repeatedly and expressly confirmed that she is *not* alleging that the relevant market is limited to Medicare/Medicaid patients, or "high risk patients," or those patients requiring access to a neonatal ICU.[11] Instead, Plaintiff has consistently asserted that the relevant product market is the "full service of OB-GYN patients at Christiana Care." (*Id.* at 37) In light of this, Plaintiff has not sufficiently explained how the subset of low-income, high-risk OB-GYN patients at Christiana Care would have great relevance to whether Plaintiff successfully pleaded a relevant product market.

For these reasons, Plaintiff has not pleaded a plausible product market.

### 2. Geographic Market

"'The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks[.]'" *Tunis Bros. Co.*, 952 F.2d at 726 (alteration in

---

[10] The boundaries of such a submarket will depend on certain factors, including "'industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Tunis Bros. Co.*, 952 F.2d at 723 (quoting *Brown Shoe Co.*, 370 U.S. at 325); *see also Satnam Distribs. LLC*, 140 F. Supp. 3d at 418 n.12.

[11] According to Defendants, Plaintiff is not a neonatologist and does not provide services in a neonatal ICU. (Tr. at 16, 20)

original) (citation omitted). "Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Id.*

Plaintiff asserts that her pleaded relevant geographic market (Delaware) is adequate because "[s]he was a solo practitioner, whose patient base consisted of a large number of high-risk patients, as well as patients on Medicaid." (D.I. 31 at 10) And those patients, she argues, "would be unable to travel to find another physician." (D.I. 31 at 11) Plaintiff's argument fails for at least two reasons.

First, as described above, Plaintiff has rejected the position that the relevant product market should be limited to "high risk" and/or Medicaid (or Medicare) patients. (Tr. at 37-38) As such, it would be wrong for the Court, on the one hand, to allow Plaintiff to describe the relevant product market as consisting of all OB-GYN services, and then permit Plaintiff, on the other hand, to define the relevant geographic market only by referencing factors that relate to a much more narrow group of OB-GYN patients. *Cf. Tunis Bros. Co.*, 952 F.2d at 726 (describing the relevant geographic market as the area "in which the seller attempts to sell its product").

Second, Plaintiff does not allege any facts that plausibly explain *why* some or all Delaware-based OB-GYN patients would be limited to seeking services in Delaware and only in Delaware. *See id.* at 727 ("The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market."); *Synthes, Inc. v. Emerge Med., Inc.*, C.A. No. 11-1566, 2012 WL 4473228, at *7 (E.D. Pa. Sept. 28, 2012) (finding an alleged geographic market was not plausibly alleged where the plaintiff had "made no effort to explain why the relevant market [was] limited to the United States"). Plaintiff does not plead facts explaining why, for example,

17

a Delaware-based OB-GYN patient would not seek out OB-GYN services at hospitals in other neighboring states, like Pennsylvania, New Jersey, and/or Maryland.[12]

For these reasons, Plaintiff has failed to sufficiently plead a relevant geographic market as well.

## IV. CONCLUSION

For the reasons set out above, the Court GRANTS Defendants' Motion, to the extent it seeks dismissal of Count I as to all Defendants.

Defendants sought dismissal of the claim with prejudice. (D.I. 23 at 20; D.I. 32 at 10) In Plaintiff's answering brief, she did not specifically seek leave to amend, (D.I. 31), though her counsel made such a request at oral argument, (Tr. at 53). Although Federal Rule of Civil Procedure 15 states that leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a)(2), dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile. *Perlmutter v. Salton, Inc.*, C.A. No. 09-690-GMS, 2010 WL 3834040, at *5 (D. Del. Sept. 24, 2010).

Here, the Court determines that permitting leave to amend the Sherman Act claim would indeed be futile. It so concludes not simply because Plaintiff has already amended her complaint once, but more importantly, because when Plaintiff was confronted by the deficiencies in the FAC relating to the Sherman Act claim, her arguments against dismissal were often flatly contradicted by the content of the FAC itself. This is a strong indicator that allowing further amendment of Count I would be an exercise in futility.

---

[12] Indeed, in discussing a different subject in her answering brief, Plaintiff seemed to acknowledge that her "potential patients" might in fact have "travelled over state lines" to seek OB-GYN services. (D.I. 31 at 10 n.6)

18

An appropriate Order follows.