**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

LYNN E. TALLEY, D.O., )
)
      Plaintiff, )
)
v. )    Civil Action No. 17-926-CJB
)
CHRISTIANA CARE HEALTH SYSTEM, )
)
      Defendant. )

Michele D. Allen, ALLEN & ASSOCIATES, Wilmington, DE, Attorney for Plaintiff.

Joanna J. Cline and James H. S. Levine, PEPPER HAMILTON LLP, Wilmington, DE; Barbara T. Sicalides, Barak A. Bassman, and Megan Morley, PEPPER HAMILTON LLP, Philadelphia, PA, Attorneys for Defendant.

## MEMORANDUM OPINION

October 9, 2019
Wilmington, Delaware



**BURKE, United States Magistrate Judge**

In the operative Second Amended Complaint ("SAC") in this employment litigation matter, Plaintiff Lynn E. Talley, D.O. ("Plaintiff") now asserts claims for breach of contract (Count I), defamation (Count II), interference with prospective economic advantage (Count III), tortious interference with contractual relations (Count IV), and breach of the implied covenant of good faith and fair dealing (Count V) against remaining Defendant Christiana Care Health System ("Defendant" or "Christiana Care"). Presently before the Court is Defendant's motion for summary judgment on all Counts, filed pursuant to Federal Rule of Civil Procedure 56 (the "Motion"). (D.I. 126) For the reasons set out below, the Court GRANTS the Motion.

## I. BACKGROUND

### A. Factual Background

In this Section, the Court will only provide a broad outline of the background facts relevant to this litigation. The specific facts that are relevant to the individual causes of action at issue in this Motion will be further set out in Section III below.

Plaintiff is a board-certified physician in the field of obstetrics and gynecology ("OB/GYN"). (D.I. 67 at ¶¶ 2, 15) She is a resident of Pennsylvania and previously had a private practice in Newark, Delaware. (*Id.* at ¶¶ 2, 10) Defendant Christiana Care Health System is a private, non-profit corporation headquartered in Newark, Delaware that runs a teaching hospital at issue in this litigation (the hospital will also be referred to herein as "Christiana Care"). (*Id.* at ¶¶ 3, 34)

Plaintiff was a member of the Medical-Dental Staff at Christiana Care from 1982 until her termination on July 15, 2016. (*Id.* at ¶ 16) She was granted privileges to practice medicine at Christiana Care in accordance with Christiana Care's Medical-Dental Staff Bylaws

2

("Bylaws") and Medical-Dental Staff Credentials Manual ("Credentials Manual"). (*Id.* at ¶ 17; D.I. 127, exs. 1-2) Specific provisions of these two documents will be described below in Section III regarding the discussion of Plaintiff's claims.

Plaintiff was involved in a number of incidents involving patients that are relevant to this litigation and to the Motion. The first such incident involved a patient whose initials are L.B.; as a result of this incident, Plaintiff's privileges to practice at Christiana Care were suspended on March 24, 2016, a suspension that lasted until April 23, 2016. (D.I. 67 at ¶¶ 47, 69) During the time period in which Plaintiff's privileges were suspended, Plaintiff had pending an application to renew her privileges to practice at the hospital. (*Id.* at ¶ 77) Ultimately, on May 9, 2016, Christiana Care's Board of Directors ("Board") approved a conditional four-month renewal of Plaintiff's privileges; this renewal was subject to certain conditions, one of which was that Plaintiff could engage in no subsequent "behavioral or clinical issues that are found by the Department of Obstetrics and Gynecology Peer Review Committee ['OB/GYN Peer Review Committee'] to constitute 'at-risk' or 'reckless' behavior." (D.I. 127, ex. 26; *see also id.*, exs. 21-25)

Shortly after the conditional renewal, Plaintiff was involved in two more incidents involving patients whose initials are W.C. and T.D. (D.I. 127 at 8-9; D.I. 142 at 8-9) These incidents were reviewed by the OB/GYN Peer Review Committee on July 12, 2016, and that committee, by consensus decision, found Plaintiff's conduct in each case to amount to "At-Risk" behavior. (D.I. 127, ex. 28) Therefore, effective July 15, 2016, Defendant revoked Plaintiff's privileges at the hospital. (*Id.*, ex. 35)

### B. Procedural Background

3

On July 10, 2017, Plaintiff filed her original Complaint against Defendant Christiana Care and against two individuals: Dr. Matthew Hoffman and Dr. Kenneth Silverstein (the "Individual Defendants"). (D.I. 1) Two days later, the case was referred to the Court for handling through case-dispositive motions. The following month, the parties jointly consented to the Court's jurisdiction to conduct all proceedings in the case. (D.I. 11)

Plaintiff subsequently filed a First Amended Complaint ("FAC"), (D.I. 17), and Defendants countered with a motion to dismiss original Counts I-VIII (the "first motion to dismiss"), (D.I. 22). In a Memorandum Opinion and accompanying Order issued on October 11, 2018, (D.I. 61; D.I. 62), the Court granted the first motion to dismiss with prejudice as to all Defendants with regard to original Count I, which alleged a violation of Section 1 of the Sherman Antitrust Act. In a separate Memorandum Opinion and Order issued on October 17, 2018, (D.I. 63; D.I. 64), the Court addressed the remaining counts challenged in the first motion to dismiss. The Court dismissed with prejudice original Counts III and VIII (procedural due process claims) as to all Defendants, dismissed without prejudice original Count V (intentional infliction of emotional distress) as to all Defendants, dismissed without prejudice original Count VI (interference with prospective economic advantage) and original Count VII (tortious interference with contractual relations) as to the Individual Defendants, and denied the motion regarding original Counts II (breach of contract), IV (defamation), VI and VII as to Defendant Christiana Care. (D.I. 63; D.I. 64)

On November 2, 2018, Plaintiff filed the SAC. (D.I. 67) On December 3, 2018, the Individual Defendants filed a motion to dismiss Count III (interference with prospective economic advantage) and Count IV (tortious interference with contractual relations) of the SAC against them (the "second motion to dismiss"). (D.I. 70) The Court granted the second motion

4

to dismiss with prejudice on February 19, 2019, leaving no further claims against Dr. Hoffman and Dr. Silverstein. (D.I. 100; D.I. 101) On March 5, 2019, Plaintiff filed a motion for reconsideration as to the Court's decision, (D.I. 106), which the Court later denied, (D.I. 135).

Defendant Christiana Care filed the instant Motion on June 14, 2019. (D.I. 126) The Motion was fully briefed as of July 30, 2019. (D.I. 151) At the parties' request, (D.I. 153; D.I. 155), the Court heard argument on the Motion on August 27, 2019. (D.I. 165 (hereinafter "Tr."))

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). If the moving party has sufficiently demonstrated the absence of such a dispute, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks, citation and emphasis omitted). If the nonmoving party fails to make a sufficient showing in this regard, then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

5

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is "genuine," only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, asserting that a fact is—genuinely disputed must support the assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.   DISCUSSION

As noted above, Defendant's Motion puts at issue each of the remaining Counts. Below, the Court concludes that summary judgment is appropriate as to all Counts, since there are no genuine disputes as to any material fact and Defendant is entitled to a judgment as a matter of law with regard to each of the claims.[1] The Court will discuss each Count below in turn.

---

[1]     In light of the nature of the Court's decision, the Court need not discuss certain issues raised by Defendant in its Motion, including: (1) whether Defendant is immune from damages under the Health Care Quality Improvement Act regarding Plaintiff's claims of breach of contract and breach of the implied covenant of good faith and fair dealing; (2) whether Plaintiff failed to exhaust her administrative remedies; and (3) whether Plaintiff failed to mitigate her damages. (D.I. 127 at 11-16) Defendant also argued that it is entitled to attorneys' fees in this action if Plaintiff does not prevail, (*id.* at 24-25), but the Court finds that such a request was premature and should be filed separately from the Motion. After all, the Motion is for summary

6

### A. Breach of Contract (Count I)

With Count I, Plaintiff argues that Defendant breached its contractual obligations because Defendant "failed to follow the procedures set forth in the Credentials Manual in connection with Plaintiff's conditional renewal and subsequent termination." (D.I. 142 at 17) With regard to this breach of contract claim, below the Court will first set out the relevant facts and then will discuss the relevant legal standards. Thereafter, it will address the substance of Defendant's Motion.

#### 1. Relevant Facts

##### a. Plaintiff's Renewal Application, the L.B. Incident and the Suspension of Plaintiff's Privileges

On February 29, 2016, Plaintiff applied to renew her privileges at Christiana Care. (D.I. 67 at ¶ 77) This application would remain pending through the month of March 2016.

Not long thereafter, on March 15, 2016, Plaintiff was covering patient L.B. at the hospital; L.B. was 33 weeks pregnant and required an emergency Cesarean section operation. (D.I. 127, ex. 7 at CCHS-00129166; *see also* D.I. 127 at 4) Due to a failure in communication (the reasons for which are disputed and not ultimately material here), Plaintiff began the procedure before L.B. was anesthetized, causing L.B. to cry out in pain. (D.I. 127, ex. 7 at CCHS-00129166; *id.*, ex. 9 at ¶ 7) Later, after L.B. was sedated, Plaintiff completed the Cesarean delivery. (*Id.*, ex. 7 at CCHS-00129167; *id.*, ex. 53 at 43)

On March 23, 2016, the OB/GYN Department held a safety de-brief to discuss the L.B. incident. (*Id.*, ex. 9 at ¶ 8) Following that discussion, on March 24, 2016, Christiana Care notified Plaintiff by letter that due to "concerns" that the OB/GYN Department had with regard to Plaintiff's care of L.B., Plaintiff's privileges were now subject to a "precautionary

---

judgment on Defendant's liability, and liability issues must first be decided before any motion for fees would be well-taken. Thus, the Court will not address the attorneys' fees issue herein.

suspension . . . imposed in accordance with [Section] 6.C of the [] Credentials Manual." (*Id.*, ex. 11 at CCHS-00087045)

This suspension was thereafter reviewed on March 30, 2016 by the OB/GYN Peer Review Committee,[2] which determined Plaintiff's conduct to be "At-Risk Behavior."[3] (*Id.*, ex. 7 at CCHS-00129166-67) Then on March 31, 2016, the OB/GYN Credentials Committee[4] met and recommended that Plaintiff's precautionary suspension be terminated upon Plaintiff meeting certain conditions. (*Id.*, ex. 13) Dr. Hoffman, who became the OB/GYN Department Chair ("department chair") on April 1, 2016, reviewed the OB/GYN Credentials Committee's recommendations, and determined that this recommendation should be modified. Thereafter, Dr. Hoffman transferred both the OB/GYN Credentials Committee's recommendation and his own supplemental recommendation to Christiana Care's Medical Executive Committee ("Executive Committee")[5] for its consideration of both proposals. (*Id.*, ex. 15 at CCHS-00129121; *id.*, ex. 46 at 103-05)

---

[2]    The OB/GYN Peer Review Committee is tasked with reviewing the clinical conduct of the Department's attending physicians; it is comprised of other qualified OB/GYN practitioners with comparable training and experience who can render an unbiased opinion on the quality of care at issue and on a physician's conduct. (D.I. 127, ex. 9 at ¶ 3)

[3]    Under Christiana Care's Culture of Responsibility Physician Algorithm, a physician's assertedly problematic conduct may be classified as "Human Error," "At-Risk Behavior" or "Reckless Behavior"; any of these findings could lead to remedial action against the physician. (D.I. 127, ex. 12)

[4]    The OB/GYN Credentials Committee is an advisory committee that, *inter alia*, is responsible for reviewing new applications for privileges from non-credentialed OB/GYN physicians, as well as applications for privilege renewal submitted by physicians who are already a part of the Medical Staff of Christiana Care. (D.I. 127, ex. 9 at ¶ 4)

[5]    The Executive Committee is comprised of section chiefs, elected department representatives and other senior leaders of Christiana Care; among its responsibilities is that it reviews applications for privileges (including renewal applications) and makes recommendations

On April 4, 2016, the Executive Committee met to evaluate Plaintiff's precautionary suspension. (*Id.*, ex. 15) The Executive Committee ultimately decided to continue the initially-entered "precautionary suspension" as a "summary suspension"; in doing so, it set out a number of conditions that Plaintiff must meet in order to later have the suspension terminated and her privileges reinstated. (*Id.*, exs. 15-16) This summary suspension was lifted on April 23, 2016 as a result of Plaintiff's agreement to abide by certain conditions allowing for her reinstatement. (*Id.*, ex. 17)

**b.    Evaluation of Plaintiff's Application for Renewal of Privileges**

During the time period described above when Plaintiff's privileges were suspended, Plaintiff's application for privileges renewal continued to remain pending. Coincidentally, on April 5, 2016 (the day after the Executive Committee's meeting to review Plaintiff's precautionary suspension), the OB/GYN Credentials Committee met to review several renewal applications, including Plaintiff's application. (*Id.*, ex. 9 at ¶ 13) Because the Executive Committee had just decided the day prior to enter a summary suspension as to Plaintiff, the OB/GYN Credentials Committee discussed whether to renew Plaintiff's privileges for a term less than the standard two-year term. (*Id.*) However, the committee ultimately decided to defer making any recommendation on Plaintiff's renewal application until the department chair (Dr. Hoffman) "had the opportunity to seek additional input." (*Id.*; *see also* D.I. 142, ex. 52 at CCHS-00045463)

Thereafter, Dr. Hoffman met with Dr. Silverstein (Christiana Care's Chief Clinical Officer) and Defendant's in-house counsel. (D.I. 127, ex. 9 at ¶ 13) These three thereafter

_____

to Christiana Care's Board of Directors as to whether such applications should be granted. (D.I. 127, ex. 9 at ¶ 6)

9

developed a recommendation that Plaintiff's privileges should be renewed only for a four-month term (i.e., less than the standard two-year term for renewal). (*Id.*) The recommendation was that this four-month renewal would also be conditioned on Plaintiff's compliance with certain conditions, including: (1) that Plaintiff continue to follow the conditions imposed by the Executive Committee upon the lifting of her summary suspension; and (2) that Plaintiff refrain from engaging in "at-risk or reckless conduct" as determined by the OB/GYN Peer Review Committee. (*Id.*) Dr. Hoffman did not speak with Plaintiff before he and his colleagues fashioned this recommendation. (D.I. 142, ex. 9 at 137)

Thereafter, Dr. Hoffman—without again consulting the OB/GYN Credentials Committee—provided this recommendation for a conditional renewal to the Medical-Dental Staff Peer Review Committee, an advisory group of physician leaders. (D.I. 127, ex. 9 at ¶ 13; D.I. 142, ex. 9 at 205)[6] On April 8, 2016, the Medical-Dental Staff Peer Review Committee reviewed and endorsed the recommendation. (D.I. 127, ex. 9 at ¶ 13) Dr. Hoffman then presented this recommendation to the Medical-Dental Staff Credentials Committee ("Staff Credentials Committee"); that committee reviewed and endorsed the recommendation on April 20, 2016. (*Id.*; *see also id.*, ex. 21) Dr. Hoffman next presented the recommendation to the

---

<sup>6</sup>        Plaintiff asserts that Dr. Hoffman's actions in presenting this conditional renewal recommendation amounted to "deceptive conduct[.]" (D.I. 142 at 18) More specifically, Plaintiff asserts that Dr. Hoffman falsely made it appear to the Medical-Dental Staff Peer Review Committee that this recommendation came from the OB/GYN Credentials Committee, when in fact that committee had deferred making any final recommendation at its April 5, 2016 meeting. (*Id.*) And Plaintiff also claims that Dr. Hoffman later altered meeting minutes from the OB/GYN Credentials Committee's April 5, 2016 meeting, to make it appear that the conditional four-month renewal recommendation was the recommendation generated by Dr. Hoffman and his two colleagues). (D.I. 142 at 7, 18 (citing *id.*, ex. 19); Tr. at 155-56) Defendant denies that Dr. Hoffman engaged in any deceptive conduct, or that he altered any of these meeting minutes in such fashion. (D.I. 151 at 12 n.15) The Court will discuss this issue, and its relevance to the Motion, further below.

10

Executive Committee, who endorsed it on May 2, 2016. (*Id.*; *see also id.*, ex. 22) No member of either the Staff Credentials Committee or the Executive Committee met with Plaintiff prior to the committees' respective endorsements. (D.I. 142, ex. 9 at 137-38)

Thereafter, on May 9, 2016, Christiana Care's Board—the final decisionmaker on credentialing issues—approved this recommended conditional renewal. (D.I. 127, ex. 9 at ¶ 14; *id.*, ex. 25) Plaintiff was notified by letter on May 17, 2016 of the conditional renewal (which was to be effective June 1, 2016) and of its specific terms. (*Id.*, ex. 26) One of the conditions set out in the letter, previously referenced above, was that Plaintiff's renewal of privileges was conditioned on her having "[n]o further workplace concerns regarding behavioral or clinical issues that are found by the [OB/GYN] Peer Review Committee to constitute 'at risk' or 'reckless' behavior." (*Id.* at CCHS-00000563)

### c. The W.C. and T.D. Incidents and the Termination of Plaintiff's Privileges

A month after this conditional renewal became effective, at least two more incidents involving Plaintiff had occurred. On June 20, 2016, Plaintiff performed a vacuum-assisted delivery involving patient W.C.; out of that procedure arose a dispute between Plaintiff and Defendant as to whether the hospital's Department of Pediatrics had been notified to have a physician attend the delivery (or, if not, whether Plaintiff was responsible for the failure of notification). (D.I. 127 at 8; D.I. 142 at 8) Additionally, on July 2, 2016, an attending physician performed a Cesarean section delivery on patient T.D.; out of that procedure arose a dispute between Plaintiff and Defendant as to whether Plaintiff (who had left the hospital prior to the delivery) had agreed to maintain responsibility for this patient, and whether Plaintiff was at fault for failing to return calls about the patient for a period of time on the morning of the delivery. (D.I. 127 at 8-9; D.I. 142 at 8-9)

11

The W.C. and T.D. incidents were thereafter referred to the OB/GYN Peer Review Committee for review. Before that 12-member committee met to discuss the cases, four of its 12 members met with Plaintiff to solicit her version of the incidents. First, on July 7, 2016, Dr. Hoffman (a member of this committee) along with Dr. Elizabeth Zadzielski and Dr. Philip Shlossman (also members of the committee) met with Plaintiff for approximately one hour to discuss her conduct in, *inter alia*, the W.C. and T.D. cases. (D.I. 127, ex. 9 at ¶ 19; *id.*, ex. 33; *id.*, ex. 46 at 221-23) Second, prior to the OB/GYN Peer Review Committee meeting, Dr. Gordon Ostrum (another member of the committee) met with Plaintiff and discussed the W.C. case with her. (*Id.*, ex. 48 at 106)

The OB/GYN Peer Review Committee met on July 12, 2016 to review the W.C. and T.D. incidents. (*Id.*, ex. 28) During that meeting, Dr. Hoffman presented Plaintiff's perspective on the W.C. and T.D. cases to the committee. (*Id.*, ex. 9 at ¶ 21) Dr. Ostrom also reported that he had spoken to Plaintiff and relayed her views about the W.C. case to the committee. (*Id.*; *id.*, ex. 28; *id.* ex. 48 at 107-08) During the meeting, the committee came to the consensus decision that Plaintiff's conduct in each of the W.C. and T.D. cases amounted to "At-Risk Behavior" and it recommended that Plaintiff receive "[c]oach[ing]" as a remedy. (*Id.*, ex. 28 (emphasis omitted))[7] However, because the "at-risk" findings by the Committee triggered one of the conditions by

---

[7]     Some members of the OB/GYN Peer Review Committee were not informed, prior to the committee making this consensus decision, that the "at-risk" designation would lead to termination of Plaintiff's privileges (i.e., due to the content of the conditional renewal). (D.I. 142 at 9 (citing *id.*, ex. 3 at 122; *id.*, ex. 4 at 189; *id.*, ex. 6 at 132-33); Tr. at 101) Other members of the committee were aware of this before making the decision. (Tr. at 101) Plaintiff contends that all of the committee members should have been so informed, (D.I. 142 at 9), while Defendant explains that this was not done so that committee members who had longtime personal relationships with Plaintiff would be able to provide an "impartial, unbiased review" of Plaintiff's actions in the two cases, (Tr. at 102-03).

which Plaintiff's conditional renewal of privileges would be terminated, the following day Dr. Silverstein notified Plaintiff in writing that her privileges would, in fact, be terminated. (*Id.*, ex. 35) This letter also noted that: (1) Plaintiff's termination would be effective July 15, 2015; and (2) Plaintiff was "entitled to a hearing and [would] be informed of the particulars shortly." (*Id.*)

On July 20, 2016, Defendant sent Plaintiff a letter stating that she was entitled to a hearing to dispute the "workplace concerns" (i.e., the "at-risk" findings by the OB/GYN Peer Review Committee) leading to her termination. (*Id.*, ex. 36) Plaintiff initially requested that a hearing be held, and so Defendant retained a Hearing Officer and identified a three-member Hearing Panel. (*Id.*, exs. 37-38) However, the hearing was never conducted, due to a dispute that arose between the parties about the scope of the Hearing Officer's authority to decide certain issues. (*Id.*, exs. 39-41; *see also id.*, ex. 9 at ¶ 23)

### 2. Relevant Legal Standards

Under Delaware law (which applies to all of the claims still at issue here, including Count I's breach of contract claim), in order to establish breach of contract, Plaintiff must demonstrate: (1) a contractual obligation; (2) a breach of that obligation by Defendant; and (3) resulting damage. *M.M. by Thomas v. Red Clay Consol. Sch. Dist.*, C.A. No. 18-423 (MN), 2019 WL 2117646, at \*4 (D. Del. May 15, 2019) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)); *Gutridge v. Iffland*, 889 A.2d 283, at \*4 n.11 (Del. 2005). "The proper construction of any contract . . . is purely a question of law." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). When "the plain language of a contract is unambiguous *i.e.*, fairly or reasonably susceptible to only one interpretation, [courts will] construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions." *BLGH Holdings LLC v.*

13

*enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012); *see also Riverbend Cmty., LLC v.*
*Green Stone Eng'g, LLC*, 55 A.3d 330, 334 (Del. 2012) ("We have long upheld awards of
summary judgment in contract disputes where the language at issue is clear and unambiguous.")
(internal quotation marks and citation omitted). However, "[w]here reasonable minds could
differ as to the contract's meaning . . . a factual dispute results and the fact-finder must consider
admissible extrinsic evidence [if available], making summary judgment improper." *Riverbend*
*Cmty.*, 55 A.3d at 334 (internal quotation marks and citation omitted).

### 3.    Discussion

In this case, there is no dispute that two relevant contracts existed—the Bylaws and the
Credentials Manual—or that both parties are bound by the terms of these contracts. (D.I. 127 at
3; D.I. 142 at 2) There are disputes about whether certain conduct of Defendant amounted to a
breach of certain provisions of the Bylaws and/or Credentials Manual. And there are also
disputes about whether Plaintiff can demonstrate that certain alleged breaches (if they occurred)
actually caused damage to Plaintiff.

Below, the Court will address the breach of contract issues by assessing each alleged
breach asserted by Plaintiff, one-by-one. In doing so, it will determine whether summary
judgment is appropriate for Defendant as to each alleged breach.

### a.    Section 1.C of the Credentials Manual

Plaintiff first argues Defendant breached Section 1.C of the Credentials Manual,[8] which
is entitled "DELEGATION OF FUNCTIONS" and reads as follows:

---

[8]      The Credentials Manual contains 11 Articles. When referring to one of those
Articles generally, the Court will use terminology like "Article 1." But each article has various
subsections. In referring to those subsections, the Court will use terminology like "Section 1.A"
or "Section 1.A.2" and the like.

With the exception of the Telemedicine Staff Category, Christiana Care does not delegate its credentialing decisions to any outside organization. When a credentialing function is to be carried out by a member of Christiana Care management, by a Medical-Dental Staff member, or by a Medical-Dental Staff committee, such function may be delegated to a designee as appropriate, which may include, but shall not be limited to, the review of applications for appointment, reappointment or clinical privileges and/or peer review of clinical performance (*provided, however, that the department chair, after consultation with the department credentials committee, must provide the credentialing or peer review recommendations*).

(D.I. 127, ex. 2 at 4 (emphasis added)) Here, Plaintiff asserts that: (1) Dr. Hoffman failed to inform the Staff Credentials Committee (in advance of that Committee's April 20, 2016 meeting) of the fact that on April 5, 2016, the OB/GYN Credentials Committee had deferred making a recommendation about renewal of Plaintiff's privileges; and (2) instead, Dr. Hoffman only provided the Staff Credentials Committee with the conditional renewal recommendation that he, Dr. Silverstein and Defendant's in-house counsel had formulated. And from there, Plaintiff argues that this amounted to a breach of Section 1.C's requirement that the "department chair [i.e., Dr. Hoffman]" after "consultation with the department credentials committee [i.e., the OB/GYN Credentials Committee] must provide the credentialing or peer review recommendations" of that committee to subsequent decision-makers. (D.I. 142 at 18 (Plaintiff citing Section 1.C and arguing that "[i]n accordance with the Credentials Manual, the Chair is required to provide both recommendations to the [Staff Credentials Committee] in this situation" and that "[t]he [Staff Credentials Committee] was not properly informed that the [OB/GYN Credentials Committee] deferred its recommendation and the Chair failed to seek any additional input from [the OB/GYN Credentials Committee's] members"); *see also* Tr. at 154)

Section 1.C's language, even read in isolation, does not appear to support Plaintiff's argument here. It does not appear, for example, that Christiana Care (or any committee) had "delegated" any decisions or responsibilities regarding Plaintiff's renewal application to a "designee" in the manner suggested in Section 1.C. In her briefing, Plaintiff never articulates a view as to why Article 1.C is even implicated here, or as to who is the "designee" that Christiana Care supposedly empowered.

But even more importantly, the Court need not and should not read Section 1.C in isolation. Instead, it should also consider the content of the Bylaws and the remainder of the Credentials Manual. And in doing so, the Court concludes that the provisions of Article 3 of the Credentials Manual (not Article 1.C of the Credentials Manual) clearly apply to the factual scenario at play.

This dispute, after all, relates to an application for the renewal of hospital privileges. And Section 3.B.2. of the Bylaws (entitled "Reappointment") explains how "renewal application[s]" like this one are to be handled:

> Medical-Dental Staff members who wish to renew their Staff membership and/or clinical privileges must complete a renewal application. Once the information is verified and evaluated through a department review process, the department chair shall transmit a recommendation regarding the applicant's reappointment and clinical privileges to the Staff Credentials Committee and then to the Medical Executive Committee. All reappointments and clinical privileges must be approved by the Board. Details regarding the specific procedures for credentialing and processing reappointments to the Medical-Dental Staff are set forth in Article 5 of the Credentials Manual.

(D.I. 127, ex. 1 at 11) It is this process that was being followed here—i.e., an application for renewal of privileges was filed, one that was ultimately reviewed by the relevant department, then the Staff Credentials Committee, then the Medical Executive Committee and then the

16

Board. And of note, Section 3.B.2 explicitly states that as part of this process, "the *department chair shall transmit a recommendation* regarding the applicant's reappointment . . . to the Staff Credentials Committee and then to the Medical Executive Committee." (*Id.*) It does not, on its face, require the department chair to accept or transmit the recommendation *of a department-level credentials committee* (like that of the OB/GYN Credentials Committee here). (D.I. 151 at 12 (Defendant arguing that "Section 3.B.2 expressly contemplates the department chair submitting his or her recommendations following the departmental review."))

Because Section 3.B.2 of the Bylaws also makes reference to "the specific procedures for credentialing and processing reappointments" that are found in "Article 5 of the Credentials Manual[,]" (D.I. 127, ex. 1 at 11), the Court also looks to that portion of the Credentials Manual. Article 5 of the Credentials Manual, in turn, notes that with regard to "*renewal of clinical privileges* and to reappointment[,]" the "procedures relating to initial appointment will apply[.]" (*Id.*, ex. 2 at 38 (emphasis added)) And the "procedures relating to initial appointment" are set out in Section 3.A of the Credentials Manual. (*Id.* at 16-21) So the Court thus examines Section 3.A as to the procedures that must be followed regarding renewal applications, to see if that section otherwise supports or detracts from Plaintiff's argument for breach of Section 1.C.

Section 3.A's provisions are also not helpful to Plaintiff. For example, it is clear that Section 3.A.3 ("Department Chair and/or Department Credentials Committee Procedure") is the specific provision governing department-level review of applications for hospital privileges like that at issue here. (*Id.* at 17-18) And this section bolsters Defendant's argument for summary judgment on this breach claim. For example, the title of Section 3.A.3 suggests that the relevant department chair (here, Dr. Hoffman) *and/or* the relevant department credentials committee (here, the OB/GYN Credentials Committee) may end up being the relevant actor as to any

17

particular step of the renewal process—i.e., it implies that there may be certain steps that the department chair alone is authorized to take. This is only further reinforced by Section 3.A.3(1), which states that:

> Medical-Dental Staff Services will transmit the complete application and all supporting materials to the chair of each department in which the applicant seeks clinical privileges. The chair *may* seek the input of the section chief and/or department credentials committee.

(*Id.* at 17 (emphasis added)) The last sentence in the excerpt above states that the department chair "may" seek the input of the department credentials committee—and thus also indicates that the chair "may" decide not to do that—and instead may make his or her own recommendation, without the need for input of the departmental credentials committee (or the need to transfer any recommendation of such a committee to the Staff Credentials Committee). (*See* Tr. at 160) And finally, Section 3.A.3(4) requires that:

> Each chair -- *if applicable*, with the assistance of the section chief or department credentials committee -- will transmit the determination of whether the applicant has satisfied all the qualifications for appointment and the clinical privileges requested.

(D.I. 127, ex. 2 at 18 (emphasis added)) If, as Plaintiff asserts, the department chair (Dr. Hoffman) was bound to present the views of the OB/GYN Credentials Committee (e.g., its decision to defer recommendation on April 8, 2016) to subsequent reviewing committees, then Section 3.A.3(4) would not have the above-referenced "if applicable" clause. Instead, the provision would read something like "Each chair will transmit the determination of the department credentials committee . . ." or something to that effect.

For the reasons set out above, the Court finds that with regard to Plaintiff's application for renewal of privileges, Section 1.C of the Credentials Manual is not applicable. Instead, other

provisions of the Bylaws and the Credentials Manual cover this scenario, and they unambiguously do not require that a department chair convey a decision of the departmental credentials committee to subsequent decisionmakers. Therefore, the fact that Dr. Hoffman, Dr. Silverstein and Defendant's in-house counsel generated the conditional renewal recommendation that was submitted to Staff Credentials Committee—and the fact that the OB/GYN Credentials Committee's April 5, 2016 decision to defer recommendation was not communicated to the Staff Credentials Committee—do not amount to a breach of contract.[9]

_____

[9]     As was previously noted, there is a dispute as to whether Dr. Hoffman, in conveying the conditional four-month renewal recommendation to the Staff Credentials Committee, took actions to make it appear that this recommendation was that of the OB/GYN Credentials Committee. *See supra* at n.6.

For example, Plaintiff asserts that Dr. Hoffman mislead the Medical-Dental Staff Peer Review Committee (during the committee's April 8, 2016 meeting to consider renewal of Plaintiff's privileges) into thinking that the four-month conditional renewal recommendation "was the recommendation of the [OB/GYN Credentials Committee.]" (D.I. 142 at 18) In support, Plaintiff cites to meeting minutes from the April 8, 2016 meeting. (*Id.* (citing ex. 47)) Yet those minutes simply state that the "Department of Obstetrics and Gynecology is recommending" the conditional four-month renewal. (*Id.*, ex. 47 at 3) Dr. Hoffman was the Chair of that department, and he was making the recommendation, so the Court is hard-pressed to see how that notation indicates any false or incorrect statement was made by Dr. Hoffman.

Additionally, Plaintiff asserts that Dr. Hoffman altered the meeting minutes from the April 5, 2016 OB/GYN Credentials Committee to make it seem like that committee had come up with the four-month conditional renewal recommendation. In support, Plaintiff points exclusively to Exhibit 19 to her answering brief, (D.I. 142 at 18 (citing *id.*, ex. 19)); Plaintiff submitted a corrected version of the exhibit three days after her answering brief was filed, (D.I. 145)). Exhibit 19 purports to be a copy of the minutes of the April 5, 2016 meeting, but on its face, it contains a notation that it was "Reviewed by" Dr. Hoffman and by Dr. David Fink, the Chair of the OB/GYN Credentials Committee. (D.I. 145 at CCHS-00064385 (emphasis omitted)) And at the end of the document, there is a recommendation that Plaintiff be given the four-month conditional renewal (i.e., the recommendation generated by Dr. Hoffman and his two colleagues). (*Id.* at CCHS-00064392) Also of record is, *inter alia*, a different version of these April 5, 2016 meeting minutes, which also contains a notation that they were "Reviewed by" Dr. Hoffman and Dr. Fink, but that merely includes a statement that recommendation of Plaintiff's renewal has been "deferred" (i.e., it does not contain reference to a recommendation of a four-month conditional renewal of privileges). (D.I. 142, ex. 52 at CCHS-00045463 (emphasis omitted)) There is thus a factual dispute about whether these documents and others indicate that

### b.     Section 5.A.4(2) of the Credentials Manual

Next, Plaintiff asserts Defendant breached Section 5.A.4(2) of the Credentials Manual when "it unilaterally reduced Plaintiff's privileges without meeting with her first." (D.I. 142 at 19) Section 5.A.4 of the Credentials Manual is entitled "Processing Applications for Reappointment[,]" and Section 5.A.4(2) reads as follows:

> If it becomes apparent to the Staff Credentials Committee that it is considering a recommendation to deny reappointment or a requested change in staff category, *or to reduce clinical privileges*, the chair of the committee shall notify the individual of the possible recommendation and invite the individual to meet prior to any final recommendation being made. At the meeting, the individual should be informed of the general nature of the information supporting the recommendation contemplated and asked to discuss, explain or refute it. This meeting is not a hearing, and none of the procedural rules for hearings will apply. The committee will indicate as part of its report that such a meeting occurred and summarize the meeting in its report.

(D.I. 127, ex. 2 at 40-41 (emphasis added)) Here, because the standard period for a renewal of privileges at Christiana Care was two years, Plaintiff argues that if Defendant instead wanted that term to be for a lesser period of time (i.e., here, Plaintiff's conditional renewal for a four-month period), this would amount to a "reduc[tion of Plaintiff's] clinical privileges" of the type referenced in Section 5.A.4(2). (D.I. 142 at 19) Because Section 5.A.4(2) requires that Plaintiff

---

Dr. Hoffman altered these meeting minutes, and if so, whether he did so in the nefarious manner suggested by Plaintiff.

But in the end, the Court concludes that any dispute of fact here is not material to resolution of this breach of contract issue. That is, the breach of contract issue here relates to whether Dr. Hoffman was required to communicate the OB/GYN Credentials Committee's August 5, 2016 "deferral" recommendation (or any other recommendation of that committee). It is not disputed that Dr. Hoffman did not do so. The key legal question is whether he was required by contract to do so. Thus, the manner in which Dr. Hoffman presented certain meeting minutes containing his recommendation to a subsequent reviewing committee is of no moment regarding adjudication of this breach of contract claim.

"be afforded an opportunity to meet with the Chair [of the Staff Credentials Committee] to discuss the reason for the reduction and make her aware of any conditions imposed[,]" and because the Chair did not meet with Plaintiff prior to any final recommendation being made, Plaintiff asserts Defendant breached Section 5.A.4(2). (*Id.*)[10]

However, in the Court's view, Defendant's decision to shorten the period of Plaintiff's renewal to a four-month conditional renewal did not implicate Section 5.A.4(2). The Court so concludes for three primary reasons.

The first reason relates to the content of a different portion of Article 5 of the Credentials Manual: Section 5.A.5, entitled "Conditional Reappointments[.]" (D.I. 127, ex. 2 at 41) Section 5.A.5 reads as follows:

> (1) Recommendations for reappointment and renewed privileges may be contingent upon an individual's compliance with certain specific conditions. These conditions may relate to behavior (e.g., code of conduct), credentials (e.g., board certification, completion of CME requirements) or to clinical issues (e.g., general consultation requirements, proctoring). Unless the conditions involve the matters set forth in Section 7.A.1(a) of this Manual, the imposition of such conditions does

---

[10] At oral argument, Plaintiff fleetingly suggested that "other conditions" imposed on Plaintiff might qualify as "reduction[s] of clinical privileges" that in turn might implicate breaches of Section 5.A.4(2)—such as the fact that Plaintiff at one point "could no longer independently call stat." (Tr. at 150-51) To the extent Plaintiff is now making this argument, because she did not raise such an issue as the basis of the complained-of "reduction" in her briefing, the argument has been waived. *See Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*, Civil Action No. 17-1086-LPS, 2018 WL 5669168, at \*7 n.4 (D. Del. Nov. 1, 2018) (holding a new argument presented at oral argument was waived where it "was not fairly presented in [the] briefing[]") (citing cases), *report and recommendation adopted*, C.A. No. 17-1086-LPS-CJB, 2019 WL 1276028 (D. Del. Mar. 20, 2019); *cf. Tomasko v. Ira H. Weinstock, P.C.*, 357 F. App'x. 472, 479 (3d Cir. 2009) (holding that arguments raised for the first time at oral argument in the district court were waived because that method of proceeding could "deprive one's opponent of any meaningful opportunity to respond.").

21

not entitle an individual to request the procedural rights set
forth in Article 7 of this Manual[11].

(2) In addition, reappointments may be recommended for periods
of less than two years in order to permit closer monitoring of
an individual's compliance with any conditions that may be
imposed. A recommendation for reappointment for a period of
less than two years does not, in and of itself, entitle an
individual to the procedural rights set forth in Article 7.

(*Id.*) Section 5.A.5 is clearly the portion of the Credentials Manual that most directly has to do

with the recommendation at issue—not only because the recommendation was undisputedly for a

"contingent" renewal, but also because it was for a "period[] of less than two years in order to

permit closer monitoring of [Plaintiff's compliance] with any conditions that may be imposed."

And yet Section 5.A.5 never refers to such a renewal as a "reduction" in privileges. Nor does it

explicitly state that prior to any such renewal, a committee chair must meet with the affected

physician.

Second, the Court finds it notable that the authors of the Credentials Manual broke out

the discussion of "Conditional Reappointments" in Article 5 into its own subsection (i.e., Section

5.A.5). The Court reads that as an indication that: (1) conditional reappointments and/or

shorter-than-two-year reappointments are reappointment outcomes of a unique nature—unique

enough to require their own subsection; and (2) relatedly, those two reappointment outcomes are

thus different in kind from the outcomes discussed in Section 5.A.4.[12]

---

[11]     Article 7 of the Credentials Manual is entitled "HEARING AND APPEAL
PROCEDURES[.]"  (D.I. 127, ex. 2 at 51)

[12]     At a minimum, such conditional or shorter-than-two-year reappointments are
surely different in kind from one of the two outcomes described in Section 5.A.4:  a
"recommendation to deny reappointment[.]"  (D.I. 127, ex. 2 at 40)  They are, after all, outcomes
that *result* in reappointment.

22

And third, the Court also finds it relevant that in the one portion of Section 5.A.5 that discusses what process is due to those who receive shorter-than-two-year reappointments, the discussion is about a *lack* of process. In Section 5.A.5(2), the Credentials Manual notes only that a "recommendation for reappointment for a period of less than two years does not, in and of itself, entitle an individual to the procedural rights set forth in Article 7." (*Id.*) Indeed, this is notably different from Section 5.A.4(2), which *both* states that the physician does not have resort to the protections of Article 7 *and* states that she has a right to a pre-recommendation meeting. This all suggests that when it came to the reappointment outcomes discussed in Section 5.A.5, the authors of the Credentials Manual did not intend to require the hospital to provide additional process to affected physicians.

For all of these reasons, the Court finds that the language of the Credentials Manual unambiguously[13] does not support Plaintiff's assertion that a shortened privileges period equates to a "reduc[tion]" of clinical privileges—i.e., one that entitles the affected physician to a

---

[13]       The Court finds that this is the unambiguous meaning of the relevant contract at issue, pursuant to Delaware law. But even if one could conclude that this contractual language is ambiguous (i.e., subject to multiple reasonable interpretations), it would still be appropriate for the Court to resolve the issue here in favor of Defendant's (ultimately superior) position. That is because this breach of contract-related dispute is solely a legal dispute—that is, its outcome does not turn on disputed issues of fact, and no party has offered any extrinsic evidence that bears on whether this type of breach occurred. Thus, the decision here is one that a judge can and should make at this summary judgment stage (by assessing the contractual language at issue). *See Eagles Indust., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232-34 (Del. 1997) (noting that if there is uncertainty in the meaning and application of contract language, but the moving party's record is not *prima facie* rebutted so as to create issues of material fact, then a reviewing court may decide the breach of contract issue at the summary judgment stage); *see also Cordis Corp. v. Bos. Sci. Corp.*, 868 F. Supp. 2d 342, 352 (D. Del. 2012) ("If 'the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide.'") (quoting *In re Columbia Gas Sys.*, 50 F.3d 233 (3d Cir.1995)), *aff'd in part, vacated in part,* 504 F. App'x 922 (Fed. Cir. 2013).

"meeting" with the chair of the Staff Credentials Committee pursuant to Section 5.A.4(2). Thus, Defendant's failure to provide such a meeting (prior to that committee's recommendation of the conditional four-month renewal to the Executive Committee) did not amount to a breach of contract.

### c. Article 6 of the Credentials Manual

Lastly, Plaintiff asserts that Defendant, in terminating Plaintiff's privileges, breached several provisions of Article 6 of the Credentials Manual. (D.I. 142 at 20-21) According to Plaintiff, in order to terminate her privileges, Defendant was obligated to proceed under the processes set out in Section 6.B ("PROCESS FOR CORRECTIVE/REMEDIAL ACTION"). Section 6.B generally describes how recommendations for corrective or remedial action must follow certain procedures and ultimately must be approved by the Staff Credentials Committee, the Medical Executive Committee and (lastly) by the Board. (D.I. 127, ex. 2 at 43-44) Plaintiff asserts, for example, that Defendant breached Section 6.B.1 of the Credentials Manual ("Department Review and Recommendations") in her case; that provision states:

> The Department — through its Department Chair and/or the designated departmental committee — shall report in writing the grounds suggesting the need for corrective/remedial action. This report shall be supported by reference to the specific clinical activities or unprofessional conduct investigated through the Department and Peer Review Processes and shall detail the findings of those processes, the prior peer review actions to date, and recommend specific corrective/disciplinary action.

(*Id.* at 43) Plaintiff argues that Dr. Hoffman failed to comply with these procedures before Plaintiff was terminated on July 15, 2016. (D.I. 142 at 20) Plaintiff also asserts that Defendant breached Section 6.B.3 of the Credentials Manual ("Medical Executive Committee Review"), specifically the portion of that subsection that states that the Medical Executive Committee is the entity that may "recommend to the Board revocation of appointment and/or clinical privileges[.]"

24

(D.I. 127, ex. 2 at 44; *see also* D.I. 142 at 20) She argues that because "the issue of the revocation/termination of Plaintiff's privileges did not go before any reviewing body after July 12, 2016, including the [Medical Executive Committee,]" Defendant breached this provision too. (D.I. 142 at 20)[14]

For its part, Defendant makes two arguments as to why Plaintiff's breach of contract claim here must fail. First, Defendant asserts that Article 6.B does not apply to Plaintiff's termination, because that section addresses corrective or remedial action "that originates at the department level, such as through peer review[,]" whereas here, "Plaintiff's renewal condition was imposed by the Board pursuant to Section 5.A.5, not the OB/GYN Department and not any department- or staff-level committee." (D.I. 151 at 13; *see also* D.I. 127 at 18-19) Second, Defendant argues that any alleged violation of Section 6.B could not have caused resulting damages to Plaintiff, and thus was harmless. (D.I. 127 at 18-19; D.I. 151 at 11) Because the Court finds Defendant's second argument well-taken, it need not address the first.

In this case, as Defendant notes, "[e]ven if the procedures set forth in Section 6.B had applied . . . the additional layers of committee review contemplated therein would not have altered the outcome"—i.e., Plaintiff's privileges would still have been terminated. (D.I. 127 at 18) After all, there can be no reasonable dispute that in its May 17, 2016 letter to Plaintiff, which set out the terms of Plaintiff's four-month conditional renewal, the Board had "already

---

[14]     Plaintiff asserts that the only exception listed in Article 6 that would permit Defendant to avoid these procedures prior to termination is found in Section 6.C, which permits hospital representatives to impose a precautionary suspension or restriction of privileges if failure to act "may result in imminent danger to the health and/or safety of any individual or may seriously interfere with the orderly operation of [the hospital.]" (D.I. 127, ex. 2 at 44; *see also* D.I. 142 at 20-21) Defendant, however, does not assert that Section 6.C is applicable here, and so the Court need not address it further.

25

determined . . . that, if the [OB/GYN Peer Review Committee] were to find additional incidents of at-risk behavior, Plaintiff's privileges would be terminated[.]" (D.I. 127 at 18 (citing *id.*, ex. 26 (stating that Plaintiff's renewal of privileges is "conditioned upon . . . [n]o further workplace concerns regarding behavioral or clinical issues that are found by the [OB/GYN] Peer Review Committee to constitute 'at risk' or 'reckless' behavior"))[15] Moreover, it is undisputed that on July 12, 2016, the OB/GYN Peer Review Committee in fact found Plaintiff's conduct in the W.C. and T.D. incidents to amount to "At-Risk" behavior. (D.I. 127, ex. 28 (emphasis omitted); Tr. at 113-14) And Plaintiff asserts that it was her termination that is the cause of her damages here. (D.I. 142 at 21)

In light of all of that, even if after the OB/GYN Peer Review Committee's decision, the hospital *had* complied with Section 6.B.1, and even if thereafter there *had* been subsequent layers of review by the Staff Credentials Committee, the Medical Executive Committee and the Board (i.e., procedures that are called for by other provisions of Article 6, including Section 6.B.3), the outcome in question (i.e., termination) would have been no different. All of that additional inquiry would simply have revolved around these committees' assessments as to whether the OB/GYN Peer Review Committee in fact made a consensus "at-risk" determination on July 12, 2016. And again, it is an indisputable fact that the OB/GYN Peer Review Committee

---

[15]     In her answering brief, Plaintiff suggests that Defendant's May 17, 2016 letter setting out the terms of her four-month conditional renewal may not have been clear enough in indicating that if Plaintiff failed to abide by the conditions set out therein, Plaintiff's privileges would be terminated. (D.I. 142 at 21 (Plaintiff noting that the letter "never mentions termination at all")). The Court disagrees. After all, the entire point of a *conditional* renewal is that if one does not abide by the conditions, one's privileges are no longer renewed. (Tr. at 95)

did make such a determination.[16] The failure to provide such process, then, could not have caused the damages Plaintiff complains of here.

### d.    Conclusion

For the above reasons, the Court finds there are no genuine issues of material fact regarding the breach of contract claims, and that summary judgment is warranted for Defendant as to Plaintiff's allegations in Count I.

### B.    Breach of Implied Covenant of Good Faith and Fair Dealing (Count V)

In Count V, Plaintiff alleges Defendant has breached the implied covenant of good faith and fair dealing. The relevant operative facts are those summarized above in Section III.A. Thus below, the Court will first set out the applicable legal standards and then assess Defendant's arguments for summary judgment as to this Count.

### 1.    Relevant Legal Standards

"The covenant [of good faith and fair dealing] is best understood as a way of implying terms in [a contractual] agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (internal quotation marks and citations omitted). "Stated in is most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct that has the effect of preventing the other party to the contract from

---

[16]    If Plaintiff genuinely disputed the propriety of the underlying "at-risk" finding by the OB/GYN Peer Review Committee, her recourse would have been to do so through the Fair Hearing procedures that were offered to her. (D.I. 127, ex. 1 at 13-14 (Section 3.D.4 of the Bylaws setting out "Fair Hearing Procedures" that apply in the case of "revocation of clinical privileges"); *id.*, ex. 2 at 51-62 (Article 7 of the Credentials Manual setting out hearing and appeal procedures); Tr. at 141, 147-48 (Defendant's counsel noting that the "for[um] to challenge the substance of the [OB/GYN Peer Review Committee's 'at-risk'] findings was in the fair hearing"))

receiving the fruits of the bargain." *Id.* at 442 (internal quotation marks and citations omitted).

The elements of a claim for the breach of the implied covenant of good faith and fair dealing are

that there be "a specific implied contractual obligation, a breach of that obligation by the

defendant, and resulting damage to the plaintiff." *Jeter v. RevolutionWear, Inc.*, C.A. No.

11706-VCG, 2016 WL 3947951, at *6 (Del. Ch. July 19, 2016) (internal quotation marks and

citations omitted); *see also Kyle v. Apollomax*, LLC, 987 F. Supp. 2d 519, 527 (D. Del. 2013).

Parties are liable for breaching the covenant when "their conduct frustrates the 'overarching

purpose' of the contract by taking advantage of their position to control implementation of the

agreement's terms." *Dunlap*, 878 A.2d at 442 (citation omitted).

    Applying the covenant, however, "involves a cautious enterprise," in which one

"generally cannot base a claim for breach . . . on conduct authorized by [an] agreement." *Nemec

v. Shrader*, 991 A.2d 1120, 1125–26 (Del. 2010) (internal quotation marks and citation omitted).

To be sure, the Delaware Supreme Court "has recognized 'the occasional necessity' of implying

contract terms to ensure the parties' 'reasonable expectations' are fulfilled." *Dunlap*, 878 A.2d

at 442 (citation omitted). "This quasi-reformation, however, 'should be [a] rare and fact-

intensive' exercise, governed solely by 'issues of compelling fairness[,]'" *id.* (citation omitted),

and is one that is only "rarely invoked successfully[,]" *Kuroda v. SPJS Holdings, L.L.C.*, 971

A.2d 872, 888 (Del. Ch. 2009). For example, the "implied covenant will not infer language that

contradicts a clear exercise of an express contractual right." *Nemec*, 991 A.2d at 1127. And

"[o]nly when it is clear from the writing that the contracting parties 'would have agreed to

proscribe the act later complained of . . . had they thought to negotiate with respect to that

matter' may a party invoke the covenant's protections." *Dunlap*, 878 A.2d at 442 (citation

omitted).

## 2. Discussion

In responding to the Motion, Plaintiff argues that Defendant breached the implied covenant of good faith and fair dealing, and acted in an "arbitrary and unreasonable" manner, in three ways: (1) by "[t]erminating Plaintiff's privileges without providing her an opportunity to be heard" with regard to the aftermath of the T.D. and W.C. incidents; (2) by terminating Plaintiff's privileges even though the outcomes in T.D. and W.C. cases were not bad, especially as "compared to the number of practitioners who remain on staff with poor outcomes, including infant deaths" and (3) allowing Dr. Hoffman to circumvent the review system in various ways, which led to Plaintiff's termination. (D.I. 142 at 22-23) The Court will discuss each allegation in turn.

### a. No Opportunity to be Heard

Plaintiff first asserts she was given no "opportunity to be heard" regarding the two cases which led to her termination. (D.I. 142 at 22 ("Terminating Plaintiff's privileges without providing her an opportunity to be heard particularly over two cases w[h]ere there was no poor outcome is wholly unreasonable.")) However, even if such a contract term could be implied here, no reasonable juror could conclude that Defendant failed to provide Plaintiff with an "opportunity to be heard" prior to the OB/GYN Peer Review Committee's decision (which in turn led to her termination).

As was noted above, before the OB/GYN Peer Review Committee convened on July 12, 2016 to discuss the T.D. and W.C. cases, four of its 12 members met with Plaintiff to solicit her version of the incidents. These included Drs. Hoffman, Zadzielski and Shlossman, who met with Plaintiff for about an hour on July 7, 2016 to discuss both cases. (D.I. 127, ex. 9 at ¶ 19; *id.*, ex. 33; *id.*, ex. 46 at 221-23) And they included Dr. Ostrum, who discussed the W.C. case with

29

Plaintiff prior to the meeting. (*Id.*, ex. 48 at 106) Both Dr. Hoffman and Dr. Ostrom testified that they summarized Plaintiff's perspective on the incidents during the July 12 meeting, (*id.*, ex. 9 at ¶ 21; *id.* ex. 48 at 107-08), and the minutes from the meeting reflect this, (*id.*, ex. 28 at CCHS-00129172 (meeting minutes noting that as to the T.D. matter, Plaintiff denied that she had told others during the delivery not to call in a physician from the Pediatrics Department)).

In sum, the only evidence of record is that Plaintiff *was* given an "opportunity to be heard" prior to the OB/GYN Peer Review Committee's July 12 meeting. Thus, Plaintiff's argument for breach on this front is untenable.

### b.    Others Had Worse Outcomes

Next, Plaintiff asserts that her termination was "completely arbitrary" because the W.C. and T.D. cases had no "poor outcome[]" and because there are a "number of practitioners who remain on staff with poor outcomes, including infant deaths[.]" (D.I. 142 at 22) Such an argument cannot be the basis for the finding of a breach of the implied covenant.

The covenant, as noted above, only implies contractual terms when the party asserting the right "proves that the other party has acted *arbitrarily or unreasonably, thereby frustrating the fruits of the bargain* that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126 (emphasis added). It cannot be said that Defendant acted "arbitrarily or unreasonably" by determining that Plaintiff's conditional renewal could be forfeited (and thus Plaintiff could be terminated) if Plaintiff acted in ways deemed "at-risk" by the OB/GYN Peer Review Committee—even if that conduct fell short of a "poor outcome" (i.e., causing death). The section of the Credentials Manual that applies to conditional reappointments (Section 5.A.5) provides that reappointment may be conditioned on compliance with various exemplary conditions that clearly fall short of causing "poor outcomes" like death. These listed conditions

30

in Section 5.A.5 include failing to abide by provisions of a "code of conduct[,]" or failing to

maintain "board certification[,]" or failing to complete "CME requirements[.]" (D.I. 127, ex. 2

at 41) Thus, in agreeing to be bound by the Credentials Manual, and by the terms of her

conditional reappointment, Plaintiff could not have reasonably assumed that one of the "fruits of

the bargain" was that she could never be terminated for "at-risk" behavior that fell short of

causing a "poor outcome" (regardless of whether other physicians currently on staff at the

hospital have previously been involved in different cases that resulted in such "poor" outcomes).

(*See* D.I. 151 at 13-14)

Therefore, this argument regarding breach of the implied covenant of good faith and fair

dealing also fails.

### c.   Dr. Hoffman's Actions

Finally, Plaintiff asserts that Dr. Hoffman's actions leading up to her termination are

grounds for breach of the implied covenant. (D.I. 142 at 22-23) However, the actions at issue

relate to the privileges renewal process or the peer review process, both of which are governed

by the relevant contracts. Thus, there can be no room for the application of the implied covenant

here, where the conduct was governed by express contractual terms.

For example, Plaintiff asserts Defendant prevented her from "obtaining the benefits of the

reviewing body by allowing the chair to make unilateral recommendations without consultation

of the departmental committees[.]" (*Id.* at 22) This allegation appears to concern Dr. Hoffman's

recommendation to the Staff Credentials Committee that Plaintiff receive the four-month

conditional renewal, as part of Plaintiff's privilege renewal process. As was explained above,

this process is governed by the terms of the Bylaws and Credentials Manual. Pursuant to those

terms, the department chair has the right to provide his or her own recommendation regarding

31

renewal of privileges. *See supra* at Section III.A.3.a. Thus, the implied covenant does not apply when the relevant contracts address the conduct at issue. *Oxbow Carbon & Mins. Hdgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019).

Plaintiff also accuses Dr. Hoffman of "deliberately fail[ing] to advise the [OB/GYN Peer Review Committee] of material facts regarding the W.C., T.D., and L.B. matter[s]." (D.I. 142 at 22-23) But in making that allegation, Plaintiff fails to cite to any specific evidence that she is referring to. And so this cannot amount to articulation of a breach of the implied covenant.

Finally, Plaintiff's alleges that Dr. Hoffman altered the meeting minutes of the April 5, 2016 OB/GYN Credentials Committee meeting, at which that committee decided to defer recommendation on renewal of Plaintiff's privileges. (*Id.* at 22) However, even were Dr. Hoffman to have altered those meeting minutes, any such alteration would not help show a breach of the implied covenant. This is because the provisions of the contracts at issue provide that as department chair, Dr. Hoffman was entitled to submit his own recommendation to the next reviewing committee. *See supra* at Section III.A.3.a.; (D.I. 67 at ¶ 180 (noting that Plaintiff's claim of breach of the implied covenant is based on the assertion that Defendant "abdicat[ed] its responsibilities *imposed by the Bylaws* to restrict Plaintiffs clinical privileges") (emphasis added)). And "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of [an] agreement." *Dunlap*, 878 A.2d at 441.

### d. Conclusion

For the reasons set out above, the Court finds that Defendant is entitled to summary judgment as to Plaintiff's claim in Count V of breach of the implied covenant of good faith and fair dealing.

### C. Defamation (Count II) and Tortious Interference Claims (Counts III and IV)

Defendant next asserts that the Court should grant summary judgment as to Plaintiff's claim in Count II for defamation, and relatedly, to Plaintiff's claims in Count III (interference with prospective economic advantage) and Counts IV (tortious interference with contractual relations), which are both premised on the defamation claim.[17] Below, the Court will lay out the relevant facts regarding the defamation claim. It will then review the applicable legal standards and will go on to assess Defendant's arguments for summary judgment.

### 1. Facts

In her answering brief, in setting out why her claims of defamation should withstand summary judgment, Plaintiff focuses only on allegedly defamatory statements relating to two of her patients, referred to as Patient B and Patient D. (D.I. 142 at 6-7, 24-25)

With regard to Patient B, Plaintiff alleges that on April 20, 2016 (i.e., at a time when Plaintiff was subject to a summary suspension, which would not be lifted until April 23, 2016), Patient B came to the hospital due to a gastrointestinal issue. (*Id.*, ex. 59 ("Talley Aff.") at ¶ 8; D.I. 67 at ¶ 58) Plaintiff asserts that when Patient B asked to see Plaintiff, Defendant's nurse Melissa Jenkins told Patient B that Plaintiff "was no longer practicing at the hospital because [Plaintiff] lost [her] privileges" and would "no longer be seeing patients at the hospital." (Talley Aff. at ¶ 8) Ms. Jenkins, for her part, testified that: (1) she spoke to Patient B; (2) at another physician's instruction, she may have provided Patient B with information about OB/GYN providers other than Plaintiff with whom Patient B could follow-up; and (3) she told Patient B

---

[17]     The parties agree that Plaintiff's claims in Counts III and IV rise and fall with Plaintiff's claim of defamation. (D.I. 142 at 25; D.I. 151 at 15) Because the Court here grants summary judgment as to Plaintiff's claim of defamation, and because Plaintiff identifies no other independent tort duty owed by Defendant to Plaintiff, summary judgment on the tortious interference counts is also appropriate.

33

that Plaintiff was not currently seeing patients at the hospital. (D.I. 127, ex. 47 at 26-29)

However, Ms. Jenkins denies having said that Plaintiff had permanently lost her privileges and

would no longer be on staff at the hospital; Ms. Jenkins explained that she could not have made

such statements because, at the time, she did not know what Plaintiff's future status would be.

(*Id.*) Plaintiff asserts that the information Ms. Jenkins provided to Patient B caused Patient B

great upset, and that Patient B went on to switch to another OB/GYN provider. (D.I. 67 at ¶¶ 60-

61)

As to Patient D, Plaintiff alleges that this patient had been seen at the hospital on April

11, 2016 (i.e., while Plaintiff was subject to summary suspension). (D.I. 67 at ¶ 64; Talley Aff.

at ¶ 10)[18] Plaintiff asserts that Patient D's husband thereafter arrived at her office. Patient D's

husband was said to be "screaming and belligerent" because he was informed "by [hospital] staff

[apparently, by Ms. Jenkins][19] that Plaintiff "was no longer on staff at [the hospital]" and he

could not understand why Plaintiff "had not informed his wife" of this. (Talley Aff. at ¶ 10)

## 2. Relevant Legal Standards

In order to establish a claim for defamation (here slander) under Delaware law, a plaintiff

must establish: (1) the defamatory character of the communication; (2) publication; (3) that the

communication refers to the plaintiff; (4) the third party's understanding of the communication's

---

[18]    In Plaintiff's affidavit, submitted with her summary judgment materials, Plaintiff
mistakenly refers to this patient as "Patient A." (D.I. 151 at 15 n.19; Talley Aff. at ¶ 10; D.I. 142
at 6)

[19]    According to Defendant's brief, the allegation is that Ms. Jenkins made this
statement too. (D.I. 127 at 21) But that assertion is not clearly made in any piece of record
evidence cited by Plaintiff.

defamatory character; and (5) injury. *Essounga v. Del. State Univ.*, C.A. No. K16C-01-027 WLW, 2016 WL 1613206, at \*3 (Del. Super. Ct. Apr. 18, 2016).

### 3. Discussion

Plaintiff's defamation claim is based on the premise that Defendant's employees made the following false, defamatory statements: that (as said to Patient B) "Plaintiff had lost her privileges at the hospital, was no longer on staff and would not return[,]" (D.I. 67 at ¶ 58); and that (as said to Patient D's husband) "Dr. Talley ha[d] been removed from staff[,]" (*id.* at ¶¶ 64, 127).[20] It is undisputed that at the time that both statements were supposedly made, Plaintiff was subject to a summary suspension, such that she did not then have privileges at the hospital. Thus, the only portions of the allegedly-made statements that could be defamatory are those suggesting that Plaintiff: (1) had been removed from the staff (as opposed to being suspended) and (2) would not be returning to the hospital. (*See* D.I. 142 at 24)

As to these, the Court agrees with Defendant, (D.I. 127 at 21), that Plaintiff has failed to sufficiently establish her defamation claim. This is because the record does not contain any admissible evidence that the allegedly defamatory statements were actually made by Defendant's employee(s).

In attempting to rebut Defendant's assertion that "there is no evidence the[se] defamatory statements were made[,]" Plaintiff points to two documents. (D.I. 142 at 23-24) Neither are helpful to Plaintiff.

---

[20]      In the defamation section of her briefing, Plaintiff also makes reference to another patient, Patient C, and about how Defendant referred Patient C to another doctor. (D.I. 142 at 24; Talley Aff. at ¶ 9 (mistakenly referring to this patient as "Patient D"); *see also* D.I. 67 at ¶ 63) On its face, this does not include reference to any defamatory statement as, *inter alia*, it does not "refer to the plaintiff[.]" *Essounga*, 2016 WL 1613206, at \*3.

First, Plaintiff points to her own declaration, which was submitted along with Plaintiff's answering brief regarding the Motion. (D.I. 142 at 23-24 (citing Talley Aff.)) In the declaration, as to the purported statement to Patient B, Plaintiff states that "[m]y patient, Patient B, . . . advised me . . . [that] she was advised by Melissa Jenkins, R.N. that I was no longer practicing at the hospital because I lost my privileges and I would no longer be seeing patients at the hospital." (Talley Aff. at ¶ 8) Plaintiff also avers in the declaration that, as to the purported statement to Patient D's husband, "Patient [D]'s spouse . . . was screaming and belligerent in the lobby of my office that he had been informed by [Defendant's] staff that I was no longer on staff at [Christiana Care.]" (*Id.* at ¶ 10) Plaintiff specifically relies on these two paragraphs in opposing summary judgment. (D.I. 142 at 23-24)

These statements, however, are inadmissible hearsay. They are Plaintiff's account of what Patient B and Patient D's spouse told Plaintiff that Ms. Jenkins said. As to what Patient B or Patient D's spouse said to Plaintiff, these are out-of-court statements (i.e., statements from the patients to Plaintiff) that are being offered for the truth of the matter asserted (i.e., that Ms. Jenkins said certain things). Fed. R. Evid. 801(c). The proper way to establish that Ms. Jenkins made these statements without requiring the utilization of hearsay testimony would be to present evidence from Patient B and Patient D's spouse (or other persons who overheard the statements Ms. Jenkins supposedly made), such as through a declaration or a deposition transcript, confirming that the statements were made. Plaintiff's hearsay statement, which attempts to fill that gap, is insufficient to defeat summary judgment. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."); *see also Tolliver v. Trinity Par. Found.*, C.A. No. 14-1021-LPS, 2017 WL 3288119, at *15-16 (D. Del. Aug. 2, 2017) (finding that summary

36

judgment to defendant was warranted as to plaintiff's claim of defamation, in part because the claim rested on an out-of-court statement in an e-mail that was being offered for the truth of the matter asserted (i.e., that the allegedly defamatory statement at issue had been made)).[21]

Second, Plaintiff points to an April 14, 2016 e-mail sent from Dr. Hoffman to the nursing staff manager that states, "[t]here have been a few nurses that apparently told [Plaintiff's] patients that she has lost her privileges." (D.I. 142 at 23 (citing *id.*, ex. 40)) When viewed in context, however, the e-mail is not credible evidence that the statements at issue were made, or that Dr. Hoffman heard such statements being made. Instead, Dr. Hoffman's e-mail was clearly prompted by a letter sent from Plaintiff's counsel to Defendant's counsel three days earlier, on April 11, 2016. In that letter, *Plaintiff's counsel* asserted that counsel had been "informed" that the defamatory statements had been made. (D.I. 151, ex. 59 at CCHS-00112279 (Plaintiff's counsel stating "I was informed late this afternoon [that] the nursing staff at the hospital is informing [Plaintiff's] patients . . . she no longer has privileges at the hospital[,]" and asserting that "if these communications do not immediately stop[,] the nursing staff, individually, and the hospital will be liable for defamation[.]")) At trial, Plaintiff's counsel would not be testifying as

---

[21]     While the Court is mindful that hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony in a form admissible at trial, *see Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 465 n.12 (3d Cir. 1989), here, the Court sees no indication that such admissible evidence exists or would be presented at trial, (*see* D.I. 170 at 17-18). The sufficiency of the evidence as to this defamation claim has been at issue since early in the case, (D.I. 63 at 6-7), and in its opening summary judgment brief, Defendant clearly asserted that "there is no evidence in the record" that the alleged defamatory statements "were ever made[,]" (D.I. 127 at 21). Despite this, Plaintiff has failed to come forward with admissible evidence that the statements were made. This is grounds for grant of a summary judgment motion. *Cf. Smart Vent, Inc. v. USA Floodair Vents, Ltd.*, 193 F. Supp. 3d 395, 414-15 (D.N.J. 2016).

to any matter, especially not to what counsel heard someone else say about what someone else said.

Additionally, the only referenced, admissible evidence from a person who had knowledge regarding the alleged statements—the deposition testimony of Ms. Jenkins—indicates that the statements-at-issue were not made. Ms. Jenkins testified that her comments were limited to stating that Plaintiff "was not seeing patients at the hospital." (D.I. 127, ex. 47 at 29 ("Q. What specifically did you say to the patient . . . A. . . . that Dr. Talley was not seeing patents in the hospital."); *see id.* at 33 ("Q. Well, you were telling [the patients] what? A. That she wasn't seeing patients in the hospital, because that's what I knew.")) This would have been an entirely truthful statement at the time of Plaintiff's suspension. When pressed by Plaintiff's counsel as to whether she had also stated that Plaintiff "had actually lost her privileges and would no longer be on staff[,]"—i.e., the possibly defamatory statements at issue here—Ms. Jenkins firmly rebuffed the notion, stating "I did not say that to the patient." (*Id.* at 29) Indeed, Ms. Jenkins explained that she could not have said to the patients that Plaintiff "would not be practicing at the hospital" because at that time, she "didn't have that information to make that statement" and "didn't know . . . whether [Plaintiff] would be practicing again or not." (*Id.*)

Thus, there is no admissible evidence of record that Defendant made the defamatory statements Plaintiff attributes to it. And in fact, the evidence of record points in the other direction. Therefore, the Court grants summary judgment on the defamation and tortious interference counts (Counts II, III and IV).

**IV. CONCLUSION**

For the foregoing reasons, the Court finds that Defendant's Motion should be GRANTED as it relates to Counts I, II, III, IV and V. An appropriate Order will issue.

38

Because this Memorandum Opinion may contain confidential information, it has been
released under seal, pending review by the parties to allow them to submit a single, jointly
proposed, redacted version (if necessary) of the Memorandum Opinion. Any such redacted
version shall be submitted no later than **October 16, 2019**, for review by the Court, along with a
motion for redaction that includes a clear, factually detailed explanation as to why disclosure of
any proposed redacted material would "work a clearly defined and serious injury to the party
seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal
quotation marks and citation omitted). The Court will subsequently issue a publicly-available
version of its Memorandum Opinion.